UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JOHN L. R.,[1]

               Plaintiff,

v.

                                     Action No. 2:22cv47

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration

               Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

John R: ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rules of the Court, it is recommended that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 18) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.    PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for benefits on February 11, 2019 and June 26, 2020, alleging he became disabled on December 28, 2018. R. 264–66, 276–84.[2] Plaintiff alleges disability for seizures, gastrointestinal bleeding, back injury, right-hand injury, partial paralysis in the right hand, right shoulder problems, and diverticulitis. R. 326. Following the state agency's initial and reconsideration denials of his claims, R. 141–54, 157–73, 180–84, 197–206, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 140, 195–96. ALJ William Pflugrath held a telephonic hearing on July 14, 2021, and issued a decision denying benefits on September 8, 2021. R. 12–82. The Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 1–6. Therefore, ALJ Pflugrath's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted administrative remedies, plaintiff filed a complaint on January 31, 2022. ECF No. 1. The Commissioner answered on April 4, 2022. ECF No. 9. In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on June 8 and July 8, 2022, respectively. ECF Nos. 15–19. Plaintiff replied to the Commissioner's motion on July 29, 2022. ECF No. 20. As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

Plaintiff argues that the ALJ failed to properly evaluate opinion evidence submitted by his treating psychiatrist, Dr. William McDaniel, M.D., and failed to properly develop the record. The Court's review of the facts below is tailored to these arguments.

### A.   *Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on July 14, 2021, plaintiff provided the following information. At the time, the 53-year old lived alone in a two-story townhome for the last two years. R. 47–48. Plaintiff graduated high school and attended one year of college, but did not earn a degree. R. 49. Plaintiff served in the United States National Guard from 1986 to 1989 and the United States Army from 1989 to 1993. *Id.* While serving in the military, plaintiff injured his hand and was stabbed. R. 50, 54–55. Plaintiff received a 70% disability rating for "brain syndrome" by the Department of Veterans Affairs.[3] R. 46–47. Plaintiff then worked as a plumber for the last 15 years. R. 47, 50–51. As a plumber, plaintiff read schematics, maps, reviewed rules and regulations, worked with customers, and was a working supervisor. R. 50–51. Plaintiff also would lift 25 pounds, climb ladders, and crawl under houses. R. 52–53.

Plaintiff lost his job on December 27, 2018, when he had a seizure and fell and reinjured his arm. R. 56–57. Plaintiff then applied for plumbing jobs, but he was never hired. R. 68. Plaintiff stated that his seizures were controlled with medication and his last seizure was December 2020. R. 57–58. Because six months had passed without a seizure, plaintiff began driving to

---

[3] The Department of Veterans Affairs found that plaintiff had a service-connected disability for a brain syndrome. R. 45–47. But neither plaintiff nor his counsel knew why he was given the rating. R. 46–47. Therefore, the ALJ declined to "put a lot of weight on [the] 70% [rating]" for brain syndrome. R. 47.

3

appointments and to the doctor's office. *Id.*

For his hand injury that occurred while in the Army, plaintiff received physical therapy for his "little finger" and "ring finger on [his] right hand." R. 58. Plaintiff cannot "fully grip stuff or carry if it's a certain weight with [his] right hand," but he can pinch with his thumb and index finger. R. 59. Plaintiff also had a shoulder surgery in 1991. R. 60. Although plaintiff could do some heavy work when he was a plumber, over time he could not perform the heavy lifting required by the job. *See* R. 59–60. Plaintiff also stated that he has "terrible anxiety" from his days in the military and takes "anxiety pills." R. 63.

Plaintiff wears an arm brace that he has had for two years and previously wore a different brace while he was working. R. 59–60, 65–66. As of the time of the hearing, plaintiff has been unable to lift a gallon of milk with his right hand for about a year due, in part, to arthritis. R. 66–67, 69. When plaintiff was working as a plumber, he would "put most stuff on a dolly" and would "try to lift 30 or 40 pounds," but would sometimes be unsuccessful because of his pain. R. 71–72.

As to daily activities, plaintiff testified that he has trouble showering, bathing, cooking, vacuuming, and dusting. *See* R. 60–61. Starting two months before the hearing, plaintiff has had a home health care worker come to his home. R. 60. Plaintiff testified that he has only recently received this help because "the VA is slow" and "it took them almost three years to get [him] . . . home health care." *Id.*

Plaintiff also has diverticulitis, which was caused by medication. R. 71–72. Plaintiff underwent surgery for diverticulitis and has improved "maybe 20 percent," but still cannot "eat certain foods or stand for a period of time." R. 61. Plaintiff said that he has "severe diverticulitis[,]" and it took three years to get surgery because of blood pressure issues. R. 63.

4

Plaintiff testified that diverticulitis "makes it hard . . . to perform the way [he wants] to perform in a work environment." R. 63–64. Plaintiff has bowel movements once every three days and experiences pain in his lower abdomen. R. 64–65. Due to his pain, he has to sit for about "three or four hours a day." R. 65. Sometimes, his cramps are so bad that he must lay down. *Id.*

Plaintiff's June 2019 and March 2020 function reports contain similar information. R. 344–51, 365–72. In plaintiff's June 2019 report, he explained that he lives alone and makes breakfast, makes phone calls, goes to appointments, and heats up lunch and dinner. R. 344. He stated that he cannot tie his shoes, cut his hair or beard, and needs help remembering to take his medications. R. 345–46. He indicated that he needs help lifting things up and down the stairs and that his medications make his thinking slow. R. 346–47. Plaintiff reported going to church if he can get someone to drive him and goes to several doctors appointments a month. R. 348. Additionally, plaintiff said that his abilities to lift, remember, complete tasks, concentrate, understand, follow instruction, and use his hands are limited due to his conditions. R. 349. In March 2020, plaintiff stated that he also has difficultly dressing, bathing because of balance issues, feeding himself because he has to use his left hand, and cleaning himself after using the bathroom because he cannot use his right hand. R. 366. Plaintiff adds, in his March 2020 function report, that his ability to reach and kneel are also limited due to his conditions. R. 370. Plaintiff also reported that he gets along with authority figures. R. 371.

**B.**   *Hearing Testimony by Vocational Expert*

Linda Augins, a vocational expert ("VE"), testified at the hearing. R. 73. Based on the ALJ's hypotheticals, VE Augins found that someone with plaintiff's age, education, work history, and residual functional capacity ("RFC") could not perform plaintiff's past relevant work, but

could perform certain light jobs in the national economy, such as a mail sorter, office helper, and routing clerk. R. 73–76. VE Augins further testified that someone who could not lift or carry more than ten pounds with his dominant hand would be relegated to sedentary work. R. 76. When asked if there were any other "existing semi-skilled or skilled jobs in the national economy which the claimant hypothetical might be able to perform in which his actual past work skill[s] would be sufficient to remit new job examples with no more than some adjustment in terms of tools used, work processes, work setting[,] or industry standards," VE Augins responded no. R. 77. Lastly, VE Augins found that someone who has more than two unscheduled absences per month or who is off-task more than fifteen percent would be precluded from work. *Id.*

### C.   *Relevant Medical Record*

#### 1.   **Physical Health Record**

##### a.   **Sentara Emergency Department**

On September 9, 2018, over three months before the alleged disability onset date of December 28, 2018, plaintiff presented at the Sentara Leigh Emergency Department with acute pain in his right shoulder. R. 498. Plaintiff complained of chest pain and shortness of breath, which were unrelated to his shoulder pain. R. 499. Upon examination, plaintiff exhibited tenderness in supraspinatus, decreased range of motion in the right shoulder due to pain, pain during the empty can test on the right shoulder, and "pain on internal rotation with confrontation." *Id.* The diagnostic tests revealed no acute findings on the right shoulder and mild acromioclavicular right joint arthropathy. R. 501.

On January 31, 2019, plaintiff presented at the emergency department with complaints of lower left abdominal pain, palpitations, hypertension, and loss of appetite. R. 442. Plaintiff

6

reported that he had a seizure two days ago, has had multiple episodes of watery stools, and has had diarrhea for two days. R. 422–43. Plaintiff was found to have acute sigmoid diverticulitis. R. 442, 446. He was given IV antibiotics and his pain was controlled. *Id.* Surgery was not recommended. R. 485. Additionally, his epilepsy medication was switched from Keppra—which was prescribed by the VA Hospital—to Dilantin. R. 442, 485. During plaintiff's hospital stay, his condition improved, he was "doing well overall," and he was able to eat regular food again. R. 489; *see also* R. 2354 (noting that although plaintiff reported no significant change in symptoms, "clinically he is looking better, smiling, and sitting on chair as opposed to lying in bed with constant pain"). Plaintiff was discharged on February 5, 2019.[4] R. 493–95. Plaintiff followed up with James G. Snyder, M.D., at Sentara Surgical Specialists on February 18, 2019, and was "doing fairly well" and had "some mild abdominal pain," but overall "seem[ed] to be improving." R. 441.

On April 27, 2019, plaintiff went to the emergency department where he was seen for abdominal pain due to diverticulitis. R. 436. His labs were "unremarkable," and his CT scan showed "diverticulitis that is uncomplicated" and his lower left colon and sigmoid appeared "less inflamed from prior study." R. 436, 439. His pain was a "5 out of 10" and he had constant aching but had "no associated symptoms." R. 436. He was treated with Augmentin and discharged. R. 436–40. Plaintiff followed up with Dr. Snyder on May 6, 2019 and was doing better on Augmentin but was "still having some mild left lower quadrant abdominal pain." R. 435. The plan was for plaintiff to schedule a colonoscopy with the possibility of future surgery. *Id.*

---

[4] Plaintiff had numerous labs and scans done during his hospital stay. *See* R. 482–83. A CT scan of his abdomen and pelvis showed abnormalities in his bowel. R. 483 ("There are a few left-sided diverticula and multiple diverticula at the sigmoid. There is inflammatory stranding around the junction of descending colon and sigmoid colon at the pelvic brim.").

On June 6, 2019, plaintiff received a colonoscopy. R. 656. The colonoscopy revealed that plaintiff had a benign skin lesion near his anus, severe diverticulosis in the sigmoid colon, and no diverticular bleeding. R. 659. A polyp was also found and removed. *Id.* Plaintiff followed up with Dr. Snyder on August 15, 2019 (R. 756–59) and September 26, 2019 (R. 760–63). Dr. Snyder noted that plaintiff "seem[ed] to be doing well except for [a] nodule that continues to swell, causing pain in drain." R. 762.

On August 22, 2019, plaintiff presented at the emergency room for a seizure that led to a shin injury. R. 770. Plaintiff was released the same day. R. 770–71 ("Follow-up with:  Oral antibiotic therapy and conservative management with warm compress as noted.").

On October 18, 2019, plaintiff went to the emergency room with lower left quadrant abdominal pain due to diverticulitis. R. 810. Plaintiff complained of "sharp pain" in his abdomen and "nothing seems to make it better or worse." R. 811. He did not have diarrhea or constipation but did have blood in his stools from hemorrhoids. *Id.* Plaintiff's physical exam noted minimal tenderness to the lower left quadrant. R. 812. Three days later, on October 21, 2019, plaintiff again went to the emergency room because of worsening pain associated with diverticulitis. R. 862. He complained that for five days he has had "severe, sharp, stabbing, left lower quadrant abdominal pain that feels similar to his diverticulitis in the past." R. 862–63. A CT confirmed diverticulitis with no perforation or abscess, and plaintiff was admitted for failure of outpatient management. R. 862. Plaintiff was discharged on October 23, 2019. R. 873–74. Plaintiff was to follow up with Dr. Snyder and continue taking Ciprofloxacin and Flagyl for seven days. R. 874. Plaintiff was seen by Dr. Snyder on November 11, 2019 and was advised that his blood pressure needed to be under control before scheduling a laparoscopic sigmoid colon resection. R. 961.

8

Plaintiff was also seen in the emergency department on other occasions for the following primary concerns: hypertension and noncompliance with medication on November 6, 2019 (R. 935–36, 961–66); hypertension on December 11, 2019 (R. 935, 952–58); and hypertension and arm pain on December 14, 2019[5] (R. 948–949). Before the December 14, 2019 hospital stay, plaintiff was seen by Dr. Snyder. R. 951. Plaintiff stated that he had no abdominal pain and was again advised that his blood pressure needed to be controlled before colon surgery. *Id.*

On December 26, 2019, plaintiff presented at the emergency department with lower abdominal pain due to diverticulitis. R. 935, 937. Plaintiff appeared well and imaging was consistent with mild diverticulitis and lab work was largely reassuring. R. 938. He was discharged with antibiotics and was told to follow up with a general surgeon. *Id.*

On January 8, 2020, plaintiff arrived at the emergency department with abdominal pain and blood in his stools. R. 916. Plaintiff was sent to the emergency department from Velocity Urgent Care. R. 905–07. Plaintiff had abdominal pain and blood in his stool. R. 916. Plaintiff was treated with Dilaudid and Zofran and his pain slightly improved. *Id.* A CT scan showed mild, acute, uncomplicated, sigmoid diverticulitis with slight, interval increased inflammatory change. R. 919. Plaintiff was admitted and surgery was recommended. R. 920. Plaintiff reported having three flares of acute diverticulitis and two of those required hospitalization. R. 926. He planned to have a sigmoid colon resection, but his blood pressure was uncontrolled.[6] *Id.*

On May 25, 2020, plaintiff went to the emergency department complaining of abdominal

---

[5] Plaintiff was discharged from Sentara the same day and went to the Hampton VA Hospital where he was seen for the same complaints. R. 1377–79, 1382.

[6] Plaintiff had telehealth appointments with cardiology specialists to try to control his hypertension, among other issues. *See, e.g.,* R. 1184–85, 2765–75, 2781–87, 2803–06, 3228–30.

pain and chronic blood in his stools.  R. 1176, 1180.  Plaintiff was discharged the same day, R. 1184, but returned to the hospital on May 28, 2020, due to reported inability to have his medications filled, R. 1149, 1152–53; *see* R. 1168 ("[L]ong history of diverticulitis in the setting of poor medical compliance for his medical co-morbidities.").  Plaintiff complained of abdominal pain, vomiting, diarrhea, and blood in his stools.  R. 1153.  A CT scan showed mild acute diverticulitis involving the sigmoid colon.  R. 1158.  Plaintiff was admitted and later discharged on May 31, 2020.  R. 1173.

On June 24, 2020, plaintiff was admitted to the hospital for hypertension and chest pain. R. 2825.  Plaintiff reported having trouble controlling his blood pressure, having chest tightness, shortness of breath with palpitations, and his heart was racing.  R. 2827.  During his stay, no EKG changes were found, a chest catheterization showed his coronary arteries were normal, and the chest x-ray had no acute findings.  *Id.*  Plaintiff's dose of Toprol was increased, Norvasc was continued, and he was prescribed Lasix with potassium supplements.  *Id.*  Although no cause of the chest pains or palpitations was found, it was suspected to be caused by uncontrolled hypertension.  *Id.*

On September 9, 2020, plaintiff was admitted to the hospital for abdominal pain.  R. 3944. Plaintiff was treated for recurrent, uncomplicated acute diverticulitis and persistent hypertension. R. 3945.  During his stay, plaintiff tolerated a regular diet and his pain was controlled.  *Id.*  Plaintiff was released on September 11, 2020.  R. 3944–45.

### b.  Hampton VA Medical Center

#### i.  Dr. Lloyd Hitchings—Neurologist

Plaintiff began seeing a neurologist, Dr. Lloyd Hitchings, on January 29, 2019 for seizures.

R. 616. Dr. Hitchings noted that plaintiff had not seen a neurologist for 15 years. R. 616–17. Plaintiff's seizures were untreated for the last eight years and Dr. Hitchings changed plaintiff's seizure medication from Keppra to Dilantin because of the side effects of Keppra. R. 619.

On May 2, 2019, plaintiff was again seen by Dr. Hitchings. R. 598–99. Dr. Hitchings noted plaintiff's EEG at Sentara Leigh Hospital on March 4, 2019 was normal and that plaintiff had not had any further seizures after being prescribed Dilantin. *Id.* Plaintiff reported driving, but was told to stop. R. 599.

Plaintiff then saw Dr. Hitchings on October 3, 2019 because he had a seizure on September 20, 2019. R. 1439. Plaintiff ran out of his seizure medication and did not call to renew his prescription. *Id.* Dr. Hitchings' plan was to renew plaintiff's Dilantin and schedule a return visit in four months. R. 1437.

On August 5, 2020, plaintiff had a telephone visit with Dr. Hitchings. R. 3183. Dr. Hitchings noted that plaintiff had been seen at the hospital multiple times since February 2020, but he could not definitively conclude that any of the visits were for neurological events but indicated that it was unlikely. R. 3185.

### ii.    Stephen A. Willing, M.D.—Primary Care Doctor

Plaintiff established care with Dr. Stephen Willing as his primary care physician in April 2019. R. 1506.

On May 1, 2019, plaintiff saw Dr. Willing to follow up after his emergency room visit to address his diverticulitis. R. 604. Dr. Willing noted that plaintiff had "mild stomach pain, mild nausea but better," and slight diarrhea. R. 605. Further, Dr. Willing noted that plaintiff's diverticulitis was doing better on Augmentin. *Id.*

11

On February 26, 2020, plaintiff saw Dr. Willing for a pre-op evaluation and to schedule a non-stress test before surgery for diverticulitis. R. 1111. Plaintiff complained mostly about right arm and hand pain. *Id.* Dr. Willing noted that plaintiff still had "diverticular pain off and on." *Id.*

Plaintiff then spoke with Dr. Willing on the telephone on March 30, 2020 and complained of having blood in his stools once a week and of loose stools three times a week. R. 3273. Plaintiff had no change in occasional abdominal pain. *Id.*

### iii. Emergency Department

On January 10, 2019, plaintiff presented at the Hampton VA Emergency Department for pain in his right shoulder and hand and a seizure that he had two weeks ago. R. 1662–63. An image of his right shoulder showed mild AC joint degenerative changes. R. 1713. Plaintiff was discharged the same day with instructions to take a series of medications. R. 1664, 1670. Five days later on January 15, 2019, plaintiff was seen at the emergency room for his seizure disorder and high blood pressure. R. 1642. Plaintiff was discharged the same day with increased dosages of Amlodipine and Keppra, and with a Lisinopril prescription for high blood pressure. *Id.* Seven days later, on January 22, 2019, plaintiff was seen at the emergency department for three days of rectal bleeding, diarrhea, and a rectal lump. R. 1616. Plaintiff was discharged the same day with instructions to hydrate and take Vicodin as directed. R. 1624.

On February 8, 2019, plaintiff was seen in the emergency department for lower abdominal quadrant pain that was tender to the touch and black stools.[7] R. 1567, 1569. Imaging revealed acute diverticulitis within the sigmoid colon and a portion of the distal descending colon. R. 637.

---

[7] Plaintiff was seen on February 5, 2019 at Sentara for diverticulitis and went to the Hampton VA Hospital for continued pain. R. 1584.

Plaintiff was discharged the same day with a prescription for Augmentin. R. 1573.

On April 12, 2019, plaintiff underwent x-ray imaging for right shoulder pain. R. 632–34. The images reveled mild degenerative changes of the AC joint and glenohumeral joint. R. 632. Imaging of the neck also revealed degenerative disc space narrowing of the cervical spine with small marginal osteophytes. R. 633.

Plaintiff was seen two more times in 2019 for painful hemorrhoids and high blood pressure. *See* R. 1346, 1354, 1460–70.

At the beginning of 2021, plaintiff was seen multiple times at the emergency room for abdominal pain and bleeding. *See, e.g.,* R. 4431–32 (treating for a gastrointestinal bleeding); R. 4442 (noting abdominal pain and colitis diagnosis); R. 4447 (treating for abdominal pain and rectal bleeding).

c.    **Riverside Regional Medical Center and Preoperative and Postoperative Care**

On January 4, 2021, plaintiff saw John W. Boyd, M.D., at Riverside Gastroenterology Specialists in Newport News for diverticulitis. R. 4127. Plaintiff reported having no abdominal pain and regular bowel movements. *Id.* An abdominal exam was normal. R. 4131. Plaintiff was seen again on February 16, 2021, and reported feeling well and was referred to Dr. Billings for an elective left colon resection. R. 4152. Plaintiff was seen by Dr. Billings on March 12, 2021 for a consultation for the colon resection and plaintiff agreed to proceed with surgery. R. 4200, 4204.

Plaintiff underwent elective laparoscopic mobilization of splenic flexure and laparoscopic sigmoidectomy for his recurrent diverticulitis on April 12, 2021, and was discharged on April 14, 2021. R. 4193, 4197. His postoperative course was uncomplicated and on the day of discharge

plaintiff was tolerating his diet, vital signs were stable, and his pain was controlled.  R. 4197.

Plaintiff had postoperative complications after the colectomy and was admitted at Riverside Regional Medical Center on April 29, 2021, and was discharged on April 30, 2021.  R. 4174–91.  Plaintiff presented with abdominal pain, nausea, infrequent bowel movements, and blood in his stools.  R. 4176, 4178.  Plaintiff's "labs [were] reassuring" and a CT was normal, and his pain had improved during his stay.  R. 4181, 4183.  Plaintiff's abdominal exam was benign, and he was discharged.  R. 4191.  After discharge, plaintiff continued to complain of pain and had a telehealth appointment at Sentara Leigh Emergency Department, where he was prescribed Miralax for abdominal pain.  R. 4317.

Once his postoperative complications resolved, plaintiff reported in June 2021 that he was "doing much better."  R. 4296; *see* R. 4310 (nothing plaintiff was "recuperating well," without pain, and had regular stools.

Plaintiff did, however, request a home health aid from the Department of Veterans Affairs "just for a few months" after the surgery.  R. 4367; R. 4377 ("I am requesting home health care, I will be in the hospital for 2 days and will need home care assistance at home for 6 weeks."); R. 4335 ("Reports he is doing 'ok' but doesn't have an Aide in the home post discharge that can assist . . . services will start on Monday 4/26.").  Plaintiff reported that he needs help bathing, dressing, moving around indoors, preparing meals, and with transportation after his surgery.  R. 4338–39.

### d.    Occupational/Physical Therapy

#### i.    Adler Therapy Group

Between October and November 2018, before plaintiff's alleged disability onset date of December 28, 2018, plaintiff was seen eight times at the Adler Therapy Group for therapeutic

14

exercise and manual therapy on his right shoulder. R. 414–32. Plaintiff's primary concerns were that he cannot lay on his left side, pain and weakness in the top of his shoulder, and some pain in his elbow. R. 416–28. Plaintiff did note some improvement as he continued in therapy. *See* R. 416 ("It's feeling pretty good but it['s] still sore on the top."); R. 420 ("Patient continues to progress well.").

### ii.    Sentara Therapy Center

On November 4, 2019, November 25, 2019, and December 10, 2019, plaintiff received rehabilitative therapy for:  body mechanics, coordination, endurance, inability to perform job duties, mobility, pain, postural awareness, range of motion, sleep disturbances, and strength. R. 958, 960, 967–69. One assessment found that plaintiff "has shown measurable improvements in his shoulder and cervical [range of motion] and functional activities," which was evidenced by objective measures. R. 959. As his treatment progressed, his symptoms were noted as "better," and his compliance quality was "poor." *Id.*

Plaintiff restarted rehabilitative therapy on December 18, 2020, for chronic right shoulder pain. R. 3893. Plaintiff stated that he had to stop therapy because of uncontrolled blood pressure. R. 3894. Plaintiff reported having continued pain when reaching overhead and laying on his side. *Id.* His pain rating was a three out of ten and he reported the following functional limitations: driving, lifting, reaching, sleeping, ADLs/household chores, dressing, and bathing. R. 3894–95. Plaintiff was seen on November 25, 2020 (R. 3933–34), December 18, 2020 (R. 3915–17), December 22, 2020 (R. 3911), and December 29, 2020 (R. 3907), and reported pain levels ranging from zero to three. *See* R. 3907, 3911, 3934. Plaintiff also had therapy for his hand. During plaintiff's November 25, 2020 visit (R. 4035), an assessment noted that his "present level of

15

function" was "independent with limitations." R. 4044. Plaintiff participated in several other sessions. *See, e.g.*, R. 3983, 3991. Plaintiff noted on December 18, 2020, that his pain level was zero and his overall improvement was assessed as good. R. 3991.

### 2. Mental Health Record—Hampton VA Medical Center

#### a. Kimberly M. Ferguson, LPN

Plaintiff was referred to the Primary Care Mental Health Team for an initial screening on March 11, 2019. R. 1537. Plaintiff was seen by LPN Ferguson under the supervision of psychologist Sarah J. Ingle, Ph.D. R. 1543. Plaintiff self-reported that he had moderately severe symptoms of depression, severe symptoms of anxiety, and clinical insomnia. R. 1539–41. Plaintiff stated that depression and anxiety made it "somewhat difficult to do his work, take care of things at home, or get along with others." R. 1539–40. LPN Ferguson found plaintiff to be alert, cooperative, and oriented to all spheres. R. 1538. His speech was fluent and goal-directed, and his thought process was normal. *Id.* Plaintiff denied any suicidal or homicidal ideations. *Id.* His mood was euthymic, and his insight and judgment were intact. *Id.*

On April 30, 2019, LPN Ferguson had a telephone call with plaintiff under the supervision of clinical psychologist Kira M. Mellups. R. 607–10. Plaintiff was diagnosed by his primary care physician with depression and anxiety. R. 607. Plaintiff's self-reported individual assessments revealed that he had moderately severe symptoms of depression and severe symptoms of anxiety. R. 608–09. LPN Ferguson found plaintiff to be alert, cooperative, and oriented to all spheres. R. 608. His speech was fluent and goal-directed, and his thought process was normal. *Id.* Plaintiff denied any suicidal or homicidal ideations. *Id.* His mood was euthymic, and his insight and judgment were intact. *Id.* Plaintiff reported increased mental health symptoms due to his son's

16

death and the anniversary of his father's death. *Id.* Plaintiff was referred to chaplain services for grief counseling and given contact information for the national crisis hotline. *Id.* Although plaintiff failed to keep some of his appointments with the chaplain, *see, e.g.,* R. 677, 1071, 1415, 1477, they did speak several times, *see, e.g.,* R. 1081–82, 2005, 2182–83.

On October 8, 2019, plaintiff had a telehealth visit with LPN Ferguson under the supervision of psychologist Mellups. R. 1434. Plaintiff reported that his anxiety and depression made it "extremely difficult to do his work, take care of things at home, or get alone with others." R. 1435–36. LPN Ferguson found plaintiff to be alert, cooperative, and oriented. R. 1434. His speech was fluent and goal oriented and his thought process was normal. *Id.* His mood was positive and his judgment and insight were intact. *Id.*

On December 12, 2019, plaintiff again saw LPN Ferguson under the supervision of psychologist Corinne N. Bolander. R. 1407, 1049. Plaintiff reported his main stressors were his increasing health concerns and denied any urgent mental health needs. R. 1408. LPN Ferguson noted that plaintiff was alert, cooperative, and oriented. *Id.* His speech was fluent and goal oriented and his thought process was normal. *Id.* His mood was positive and his judgment and insight were intact. *Id.*

### b. Psychiatrist William W. McDaniel, M.D.

On December 23, 2019, nearly a year after plaintiff's disability onset date of December 28, 2018, Dr. William McDaniel saw plaintiff for medication management and supportive psychotherapy. R. 1998–2001. Plaintiff reported that he has been depressed and tearful while, at the same time, having episodes of increased energy, racing thoughts, and a decreased need for sleep. R. 1998. Dr. McDaniel found plaintiff to be casually dressed, pleasant, cooperative, alert,

17

oriented, with coherent speech and a normal rate and tone, and good eye contact. R. 1999. He found that plaintiff's thoughts were circumstantial, and plaintiff described auditory, visual, olfactory hallucinations, and sometimes referential delusions. *Id.* Plaintiff's mood was labile with tearful affect and his insight and judgment were not impaired. *Id.* Dr. McDaniel's assessment found that plaintiff had a mood disorder due to a general medical condition. R. 2000.

On March 23, 2020, Dr. McDaniel saw plaintiff for his mood disorder. R. 1091. Plaintiff reported that the Divalproex had been very helpful with his mood, but that he had another seizure last week. *Id.* Dr. McDaniel observed plaintiff was casually dressed, pleasant, cooperative, alert, and oriented. R. 1092. His speech was coherent and relevant with normal rate and tone. *Id.* Plaintiff made good eye contact, his thoughts were well organized, and his mood was euthymic with full range of affect. *Id.*

On June 23, 2020, Dr. McDaniel spoke with plaintiff. R. 2122. Plaintiff reported being anxious over his diverticulitis surgery and the possibility of more delay. R. 2123. Plaintiff was both relieved and anxious that he has been rated "100% . . . disab[led] and 'unemployable.'" *Id.* Dr. McDaniel observed that plaintiff's speech was spontaneous and with a normal rate and rhythm. *Id.* His affect was constricted and his mood was quite anxious. *Id.* His thoughts were extremely circumstantial and hard to follow. *Id.* Plaintiff's insight was remarkable for use of displacement as a defense mechanism, and his judgment was adequate. *Id.*

### c.      Group Counseling

In January 2020, notes from plaintiff's group counseling described plaintiff as "clearly in distress regarding some event in the military as well as dealing with his son's death and his father's death during the past year." R. 2275. Plaintiff said that he was experiencing anger issues and that

18

he "went off on a nurse." *Id.* Plaintiff also went to group therapy on February 6, 2020 (R. 2235–36) and March 18, 2020 (R. 1096–97), and was compliant and fully engaged.

**D.     Medical Opinions**

**1.     State Agency Physician Reviews—November 2019 and June 2020**

In November 2019, state agency consultants Daniel Walter, Psy.D., LCP, and Robert McGuffin, M.D., reviewed plaintiff's medical record.  R. 141–54.  The initial disability determination completed by the state found that plaintiff had severe impairments of gastrointestinal system, major joint dysfunction, and degenerative disc disease, and non-severe impairments of epilepsy, depression, and anxiety. R. 148.

Dr. Walter evaluated plaintiff under the criteria for the following listings:  12.04 for depression, bipolar, and related disorders, and 12.06 for anxiety and obsessive-compulsive disorders. *Id.* Dr. Walter concluded that plaintiff had no limitations in his ability to understand, remember, apply information, interact with others, adapt, or manage himself. *Id.* He found that plaintiff did have mild limitations in his ability to concentrate, persist, or maintain pace. *Id.* Dr. Walter explained that plaintiff's depression and anxiety were non-severe because plaintiff was not on any medication for his mental condition and most of his symptoms were due to his physical conditions. R. 148–49.

For plaintiff's physical ailments, Dr. McGuffin evaluated plaintiff under the criteria for the following listings:  1.02 dysfunction of major joints; 1.04 spine disorders; 11.02 epilepsy; and 5.06 inflammatory bowel disease.  R. 149.  Dr. McGuffin concluded that plaintiff could only occasionally lift 20 pounds and could frequently lift 10 pounds. R. 150.  He also stated that plaintiff could stand or walk for 6 hours in an 8-hour workday and could sit for the same amount

19

of time. R. 150–51. Dr. McGuffin rated plaintiff's postural limitations as follows:  occasionally climb ramps/stairs; never climb ladders/ropes/scaffolds; unlimited balancing; and frequently stoop, kneel, crouch, and crawl. R. 151. He also found that plaintiff had manipulative limitations in his ability to reach overhead on his right side but no visual, communicative, or environmental limitations. R. 151–52.

In June 2020, state agency consultants Richard J. Milan, Jr., Ph.D., and Joseph Duckwall, M.D., reviewed plaintiff's medical record. R. 157–73. On reconsideration, the experts found the same severe and non-severe impairments, apart from degenerative disc disease, which was found to be non-severe. R. 166. Dr. Milan evaluated plaintiff for the same listings as Dr. Walter and assessed plaintiff with the same limitations. R. 166–67. Dr. Duckwall evaluated plaintiff for the same listings as Dr. McGuffin but differed slightly in his assessment of plaintiff's limitations. R. 167–70. Dr. Duckwall found the same lifting, standing, sitting, and postural limitations. R. 168–70. But Dr. Duckwall found that plaintiff does have environmental limitations and plaintiff should avoid all exposure to hazards such as machinery and heights. R. 170.

### 2.    Medical Assessment by Dr. McDaniel

On October 14, 2020, Dr. McDaniel completed a medical source statement indicating that he treated plaintiff from December 2019 through June 2020 and listed the following impairments: mood disorder (bipolar type-depressed) due to seizures; seizure disorder; pain in right hand and shoulder; and cluster headaches. R. 3939. Dr. McDaniel opined that plaintiff's prognosis was "chronic disability." *Id.* Dr. McDaniel checked boxes indicating that plaintiff had all marked and extreme limitations with respect to the overall categories of understanding and memory, sustained concentration and persistence, and adaptation, except for the following specific tasks within the

20

categories: (a) remember locations and work-like procedures (no limitations); (b) understand and remember short and simple instructions (mild limitations); (c) make simple work-related decisions (moderate limitations); (d) ask simple questions or request assistance (moderate limitations); and (e) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (moderate limitations). R. 3939–40.

### III.   THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his RFC; and (5) had an impairment that prevents him from engaging in any substantial gainful employment. R. 15–30.

The ALJ found that plaintiff met the insured requirements[9] of the Social Security Act through December 31, 2023, and had not engaged in substantial gainful activity from December

---

[8] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[9] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

28, 2018, his alleged onset date of disability though the date of the decision. R. 17.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) disorders of the gastrointestinal system; (b) hypertension; and (c) major joint dysfunction. R. 17. The ALJ classified plaintiff's other physical impairments, specifically degenerative disc disease and epilepsy, as non-severe because "they did not exist for a continuous period of 12 months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations." R. 18. The ALJ found that plaintiff's medically determinable mental impairments of depression and anxiety "considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." *Id.* In making this determination, the ALJ noted that plaintiff's mental impairments caused no limitation in the functional areas of understanding, remembering, applying information, concentrating, persisting, maintaining pace, adapting, or managing himself. R. 18–19. And plaintiff has a mild limitation in the functional area of interacting with others. R. 18. The ALJ determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–20.

The ALJ next found that plaintiff possessed an RFC to perform light work, *see* 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to the limitations that he: (a) can frequently but not always balance, stoop, kneel, and crouch; (b) can only occasionally climb stairs and crawl; (c) can never climb ladders; (d) can have no more than frequent exposure to vibration; (e) can have no more than occasional exposure to fumes, gases, or pulmonary irritants; (f) can have no exposure

to workplace hazards such as unprotected heights/dangerous machinery; (g) can only occasionally reach overhead with the right dominant arm; (h) can frequently but not always handle objects with the right hand; (i) is limited to standing or walking up to four hours total in an eight-hour workday; (j) cannot operate a motor vehicle as part of job duties; and (k) must have ready access to a restroom.  R. 20.

At step four, the ALJ found that plaintiff could not resume any past relevant work as an apprentice plumber or plumber helper.  R. 28.  Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs in the national economy, such as a mail sorter, office helper, and routing clerk.  R. 28–29; *see also* 20 C.F.R. §§ 404.1567(a), 416.967(a).  Accordingly, the ALJ found that plaintiff was ineligible for benefits as he was not disabled from December 28, 2018, through the date of the decision, September 8, 2021.  R. 29–30.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

23

(2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *See id.*

## V.   ANALYSIS

### A.   *The ALJ committed no error in evaluating the medical opinions of Dr. McDaniel.*

First, plaintiff seeks a remand arguing that the ALJ failed to properly assess the opinion of his treating psychiatrist, Dr. William McDaniel. Pl.'s Mem. In Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 16, at 8–13. Plaintiff argues that the ALJ's mental RFC determination is unsupported by substantial evidence because the ALJ failed to properly consider the findings of Dr. McDaniel. *Id.* at 8. He contends that the ALJ "failed to create a logical bridge between the evidence and the crafted mental RFC," especially with respect to the supportability and consistency factors as required by the regulations. *Id.* at 9–10. Plaintiff also argues that the ALJ cherrypicked from the record, failed to cite findings in Dr. McDaniel's treatment notes that aligned

24

with his medical opinion, and erred by assessing plaintiff with an RFC that "did not contain any non-exertional limitations related to plaintiff's mental health." *Id.* at 11–12. Due to these errors, plaintiff asserts the ALJ's mental RFC is not supported by substantial evidence, requiring a remand for further proceedings. *Id.* at 13.

The Commissioner argues that the ALJ did not err in assessing Dr. McDaniel's medical opinion and sufficiently explained his reasons for finding Dr. McDaniel's opinions unpersuasive. Mem. Supp. Def.'s Mot. Summ. J. and in Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 19, at 15–20. The Commissioner addressed how the ALJ assessed Dr. McDaniel's medical opinion and properly explained that Dr. McDaniel's assessment was unpersuasive because it was "unsupported and inconsistent with the evidence of record." *Id.* at 17.   Further, regarding supportability, the ALJ explained that Dr. McDaniel's assessment overestimated plaintiff's limitation given the mental status examinations. *Id.* at 17–18. And, regarding consistency, the ALJ also adequately demonstrated that the opinion of "Dr. McDaniel was not supported by other evidence of record, namely, the medical source statements from other consulting physicians." *Id.* at 18.

**1.   The ALJ properly considered Dr. McDaniel's mental health consultation performed in October 2020.**

Dr. McDaniel, plaintiff's treating psychiatrist, completed a medical source statement in October 2020 concluding that plaintiff had a mood disorder, seizure disorder, pain in his right hand and shoulder, and cluster headaches. R. 3939. He reported that plaintiff had mostly marked and extreme limitations with respect to understanding and memory, sustained concentration and persistence, and adaptation. R. 3939–40.

Having reviewed the entire record, the ALJ determined that Dr. McDaniel's findings with respect to plaintiff's limitations were not persuasive because the "assessment is an overstatement of the claimant's limitations and is not consistent with the generally normal mental status exam findings noted throughout the record."[10] R. 28. The ALJ found that plaintiff was able to perform daily tasks independently prior to his recent colon surgery. *Id.* (citing exhibits 3F, 14F, 18F, 19F, and 46F). The ALJ did note that plaintiff had feelings of grief and worry, but there was no showing that plaintiff had any significant limitations in his ability to function. *Id.* (citing exhibits 3F, 14F, 18F, 19F, and 46F).

Plaintiff argues that the ALJ's analysis of supportability and consistency was "unsupported by the record because both were based on mischaracterization of the record." Pl.'s Mem. 10. Specifically, plaintiff argues that the ALJ cherrypicked from the record by generally citing plaintiff's "'normal' mental examination findings while ignoring and minimizing evidence supporting severe mental symptoms." *Id.* at 11; *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (holding an ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding"). For the reasons stated herein, plaintiff's arguments are not persuasive.

---

[10] Because the treating physician rule no longer applies, the opinions of plaintiff's treating source are not entitled to any special weight. *Compare Coffman*, 829 F.2d at 517 (referencing "great weight" to be accorded), *with* 20 C.F.R. § 404.1520c(a) (no longer deferring to or attributing any specific or controlling weight to treating source opinions for claims filed on or after March 27, 2017). Under the new rules, medical opinions are assessed for persuasiveness. 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other").

To start, the ALJ cited the record and explained his evaluation of Dr. McDaniel's opinions. R. 27–28. The ALJ relied on plaintiff's conservative course of mental health treatment, improving mental health and stability in mood and affect with medication, and normal mental status exam findings. *Id.* Prior to finding Dr. McDaniel's opinions to be unpersuasive, the ALJ cited to the relevant record evidence, which he used in his analysis. *See* R. 22–27 (starting the paragraph with "[o]verall, the evidence of record does not support the alleged loss of functioning" before finding that Dr. McDaniel's opinions were not persuasive); R. 22–24, 26 (citing to specific mental health consultations and treatments with various providers, such as the chaplain, peer groups, Dr. McDaniel, and LPN Ferguson). The ALJ appropriately referenced this discussion later when he explained why Dr. McDaniel's opinions were not persuasive. R. 28 (discussing the "normal mental status exam findings noted throughout the record" with cites to the record). The ALJ need not repeat pertinent findings multiple times throughout a ruling to support individual conclusions. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (noting "that the ALJ need only review medical evidence once in his decision"); *Kiernan v. Astrue*, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of the analysis).

As for supportability of Dr. McDaniel's source statement, the ALJ noted the relatively few interactions plaintiff had with Dr. McDaniel—December 23, 2019, March 23, 2020, and June 23, 2020. R. 23–24 (citing R. 1091–92, 1998–2000, 2122–23). Other than plaintiff's "extremely circumstantial and hard to follow" thoughts and spontaneous speech on one of the visits, Dr. McDaniel's mental health findings were relatively normal. *Id.*; R. 28. Further, Dr. McDaniel's

27

findings during these examinations do not support the marked and extreme limitations contained in his October 2020 source statement, and the assessment itself does not explain the limitations. R. 3939–40.

Plaintiff cites to Dr. McDaniel's treatment notes on December 23, 2019, which revealed that plaintiff was tearful and endorsed depression and auditory and olfactory hallucination. Pl.'s Mem. 11 (citing R. 1998). The mental status examination concluded that plaintiff had a labile mood with a tearful affect. *Id.* at 12 (citing R. 1999). Notably, plaintiff's initial mental health evaluation with Dr. McDaniel was nearly a year after plaintiff's alleged disability onset date of December 28, 2018. R. 1998. Also, Dr. McDaniel found that plaintiff was casually dressed, pleasant, cooperative, alert, oriented, using coherent speech with normal rate and tone, and exhibiting good eye contact. R. 1999. Further, although his mood was labile with a tearful affect, plaintiff's insight and judgment were not impaired. *Id.*

In finding Dr. McDaniel's opinions were not persuasive, the ALJ relied on plaintiff's normal mental status exam findings, his ability to perform daily activities, and the fact that treatment for his grief and financial worries did not show any significant limitations in his ability to function. R. 28; *see* R. 1091 (in March 2020, Dr. McDaniel found plaintiff to have good eye contact, thoughts were well organized, and his mood was euthymic with full range of affect); R. 1998–2001.

As for consistency, the ALJ discussed each functional area and provided an explanation, with citations to the record, about plaintiff's functional abilities. R. 18–19. First, the ALJ found that in the area of "understanding, remembering, or applying information," plaintiff has "no limitation" because he indicated on "his function reports that he is able to follow directions and

28

handle his finances." R. 18 (citing exhibits 5E and 8E).  Second, the ALJ found plaintiff has "mild limitation" in his ability to interact with others.  *Id.*  The ALJ explained that although plaintiff had an angry encounter with a nurse, his function reports indicate that he gets along with others, attends church, engages in social activities, spends time with others, and his treatment records showed he was pleasant and cooperative at most encounters.  *Id.* (citing exhibits 5E, 8E, 14F, and 19F).  Third, in the functional area of "concentrating, persisting[,] or maintaining pace," the ALJ found that plaintiff has "no limitation" because he can follow directions and does not need assistance with personal care or daily living activities.  *Id.* (citing exhibits 5E, 8E, and 19F).  Finally, in the functional area of "adapting or managing oneself," the ALJ found that plaintiff has "no limitation" because plaintiff is independent in daily living activities, R. 19 (citing exhibits 5E, 8E, and 19F), and exam findings note that his insight and judgment were intact and his mood was "generally euthymic," *id.* (citing exhibits 3F, 14F, 18F, and 19F).

The ALJ further relied on mental status examinations performed by LPN Ferguson to find Dr. McDaniel's opinions were inconsistent with the record.  R. 22–24, 28.  The normal mental status examinations cited by the ALJ include examinations performed by LPN Ferguson on March 22, 2019, April 30, 2019, October 8, 2019, and December 12, 2019.  R. 22–23.

In support of plaintiff's argument that the ALJ's findings conflicted with the medical record, plaintiff cites several treatment records.  Pl.'s Mem. 11–12.  Plaintiff cites to mental health care received from LPN Ferguson on April 30, 2019.  *Id.* at 12 (citing R. 607–10).  The ALJ discussed this visit and observed that plaintiff was seen for an increase in mental health symptoms "related to losing his son and the anniversary of his father's death." R. 22 (citing exhibit 3F).  The plaintiff highlights that during the visit, plaintiff's self-reported individual assessments showed

29

moderately severe symptoms of depression and severe symptoms of anxiety. R. 608–09. Also, during the same visit plaintiff scored a 62 out of 80 on the PCL-5 self-assessment for post-traumatic stress disorder. R. 610. These, however, were self-assessments by plaintiff, rather than the findings of the mental health professional. *See* R. 608 ("The remainder of the report," which includes the depressive symptoms (PHQ-9), anxiety symptoms (GAD-7), and PTSD checklist (PCL-5), are "results [] based on self-report and should be used in context with other available clinical information"). Further, LPN Ferguson's mental status evaluation of plaintiff yielded normal results. She found that he was alert, cooperative, and orientated. *Id.* His speech was fluent and goal-directed, thought process was normal, no suicidal or homicidal ideations, euthymic mood, and his insight and judgment were intact. *Id.*

Plaintiff also cited to mental health treatment notes from a group counseling session dated January 17, 2020, where plaintiff reported being angry, going "off on a nurse," and grieving the loss of his father and son. Pl.'s Mem. 12 (citing R. 2275). The ALJ also took note of this "angry encounter with a nurse." R. 23 (citing exhibit 19F). The social worker's plan was to "consider referring" plaintiff to mental heath treatment and to notify the psychiatrist. R. 2275.

Although plaintiff relies on subjective complaints and self-reporting during these mental health encounters, the objective findings of these mental health professionals, among others, consistently found plaintiff's mental status exams to be normal. *See also* R. 1539–41 (LPN Ferguson found plaintiff's mental status as normal on March 11, 2019); R. 1434 (LPN Ferguson found plaintiff's mental status as normal on October 8, 2019); R. 1408 (LPN Ferguson found plaintiff's mental status as normal on December 12, 2019); R. 1091–92 (Dr. McDaniel found plaintiff's mental status as normal on March 23, 2020). Additionally, the conservative course of

30

treatment by the mental health professionals supports the ALJ's conclusion. Having reviewed the entire record, the ALJ identified sufficient grounds for finding Dr. McDaniel's opinions unpersuasive and relied on other, more probative record evidence.

### 2. Substantial evidence in the record supports the ALJ's decision.

The ALJ's decision is well-supported by the mental health records in this case, including the notes of LPN Ferguson and Dr. McDaniel's own treatment notes; as well as the opinions of the two state agency physicians, Drs. Walter and Milan, who both found plaintiff's mental impairments to be non-severe, with no more than mild limitations in any area of mental functioning. R. 27–28. The ALJ's decision is also supported by plaintiff's ability to live independently prior to colon surgery. R. 23–24, 28. Accordingly, substantial evidence supports the ALJ's determination that plaintiff's mental health impairments were not disabling, he remained able to perform a limited range of light work as set forth in the RFC, and he possessed the capability to successfully adjust to other available work.

### B. *The ALJ committed no error in not ordering a consultative examination.*

Plaintiff also seeks a remand arguing that the ALJ's determination of plaintiff's physical RFC is unsupported by substantial evidence. Pl.'s Mem. 13–15. Plaintiff contends that the record before the ALJ could not support the "crafted physical RFC" because "there were no physical functional assessments from an examining or treating source." *Id.* at 13–14. Accordingly, plaintiff argues that given the complexity of plaintiff's physical impairments—specifically plaintiff's diverticulitis, colon surgery, and subsequent recovery—the ALJ should have ordered a physical consultative examination rather than relying on reports of "non-examining, non-treating state agency medical consultants and lay interpretation of the raw data." *Id.* at 14.

31

The Commissioner argues that the ALJ's RFC determination is well-supported. Def.'s Mem. 20–24. The Commissioner asserts plaintiff, along with his counsel, "never asserted further development of the record was necessary for the ALJ to assess his claim." *Id.* at 21. And, after the hearing, the ALJ held the record open for 45 days to permit plaintiff to supply additional information but no response, or updated medical records, were submitted. *Id.* The medical record before the ALJ—approximately 4,000 pages spanning three years and containing multiple medical professional opinions—was sufficient to fully and fairly assess plaintiff's claim. *Id.* at 22. Therefore, the Commissioner argues that "[b]ased upon the longitudinal evidence" of the record, remand is not warranted. *Id.* at 25.

### 1.    *The record contained sufficient information for the ALJ to assess plaintiff's RFC.*

As part of the five-step sequential analysis, an ALJ must determine a claimant's RFC. *See* 20 C.F.R. §§ 404.1545, 416.945. The RFC describes "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week . . . ." Social Security Ruling 96-8p, 1996 WL 374184, at *2 (July 2, 1996). An ALJ must assess a claimant's work-related abilities on a function-by-function basis. *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments). After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence. *Id.* The ALJ then uses the RFC to determine whether the claimant can perform past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five). 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5).

The determination of the RFC "is an agency-conducted administrative assessment that considers all relevant" medical and other evidence. *Caulkins v. Kijakazi*, No. 20-1060, 2022 WL 1768856, at *5 (4th Cir. June 1, 2022) (citing 20 C.F.R. § 416.945(a)(3)); *see also* 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c)).[11]   The agency's responsibility is to "develop [a claimant's] complete medical history," upon which a determination about disability may be made. 20 C.F.R. §§ 404.1512(a)(2), (b)(1), 416.912(a)(2), (b)(1).   In some cases, the evidence of record is "insufficient"—that is, lacking the information needed to assess disability, or "inconsistent"—that is, "conflict[ing]," "ambiguous," or not "based on medically acceptable clinical or laboratory diagnostic techniques." 20 C.F.R. §§ 404.1520b(b), 416.920b(b). Depending on the issues in any given case, the agency "may" seek additional evidence, for example, by recontacting medical sources, seeking more information, or by ordering a consultative examination ("CE"). 20 C.F.R. §§ 404.1520b(b), (b)(2)(i)–(iv), 416.920b(b), (b)(2)(i)–(iv); *see also* 20 C.F.R. §§ 404.1519a(b) (describing when a consultative examination may be sought), 416.919a(b) (same).

The regulations, however, only require an ALJ "to seek additional evidence or clarification if the ALJ cannot reach a conclusion about whether the claimant is disabled based upon the evidence in the case record." *Harper v. Saul*, No. 4:19cv01535-CMC, 2020 WL 6074164, at *8 (D.S.C. Oct. 15, 2020). To determine "whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contains sufficient evidence" to make a disability determination. *Loving v. Astrue*, No. 3:11cv411-HEH, 2012 WL 4329283, at *5 (E.D. Va. Sept.

---

[11] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(a), (c), 416.929(a), (c).

20, 2012) (citation and quotation omitted).  As the Fourth Circuit noted in *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (citation and quotation omitted), "[a]lthough the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, [the ALJ] is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *See also Lehman v. Astrue*, 931 F. Supp. 2d 682, 693 (D. Md. 2013) (noting that an "ALJ is under no obligation to supplement an adequate record to correct deficiencies in a plaintiff's case") (citation omitted).  Finally, while the ALJ is obligated to develop and assess the record, the burden remains on a claimant to prove that he is disabled, and to furnish known evidence of the same to the agency. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1); *see also Bowen v. Yuckert*, 482 U.S. 137, 147–48 (1987) (noting that a claimant bears the burden of proving their severe impairments preclude performance of any substantial gainful activity).

Here, the record contained ample evidence to enable the ALJ to assess disability and no need existed to seek a CE.  The ALJ extensively reviewed the record evidence relating to plaintiff's conditions dating from January 2019 through July 2021, which is after plaintiff's colon surgery. R. 21–26. The ALJ found that plaintiff suffered from the following severe impairments:  disorders of the gastrointestinal system, hypertension, and major joint dysfunction.  R. 17.  The ALJ classified plaintiff's other physical impairments, specifically degenerative disc disease and epilepsy, as non-severe.  R. 18.

The ALJ reviewed plaintiff's longstanding history of diverticulitis that required hospitalizations and surgical intervention. R. 19–27. The ALJ noted that "[t]reatment records note his physical exam findings are generally normal" and that plaintiff "has a history of noncompliance

with medication and treatment." R. 27.  The ALJ evaluated plaintiff's many treatment records noting hospital visits for abdominal pain that came and went, his surgery and postoperative complications, his subsequent recovery, and plaintiff's testimony about his improvement and continuing limitations after surgery.

The ALJ reviewed, among other things:   (1) plaintiff's visit with Sentara Surgical Specialists in February 2019 where plaintiff noted that he was doing fairly well and his abdominal pain was mild and improving;  (2) plaintiff's emergency visit in May 2019 for stomach pain where plaintiff was discharged on antibiotics and was feeling better;  (3) notes from plaintiff's primary care doctor that report plaintiff's stomach pain was better and his blood pressure was controlled; (4) plaintiff's October 2019 hospitalization for diverticulitis, with normal findings on a physical exam (other than lower left quadrant pain), and treated with antibiotics;  (5) plaintiff's visit with Sentara Surgical Specialists where he reported feeling pretty good but needed to reduce his blood pressure before colon surgery;  (6) plaintiff's hospital admission in January 2020 for diverticulitis and pain and a CT scan showing mild acute uncomplicated sigmoid diverticulitis with slight interval increased inflammatory change and plaintiff's subsequent discharge on antibiotics;  (7) plaintiff's May 2020 hospitalization for diverticulitis that noted poor medical compliance that resulted in issues with blood pressure;  (8) June 2020 care coordination records indicating that plaintiff does not require help with activities of daily living or personal care;  (9) plaintiff's report to Riverside Gastroenterology in January 2021 that he had no abdominal pain and an exam finding no tenderness;  (10) plaintiff's normal physical exam findings and mild bouts of diverticulitis in February and March 2021;  (11) plaintiff's April 2021 request for home health assistance after colon surgery, and direct care staff's finding that he is capable of increased independence in his

35

activities of daily living; (12) plaintiff's colon surgery in April 2021 and subsequent hospitalization for complications; and, (13) plaintiff's June 2021 annual physical examination by his primary care provider, noting that plaintiff was recuperating well after undergoing a partial colectomy and exam findings that plaintiff had 5/5 strength, normal tone, stable gait, full range of motion, and negative straight leg raise testing. R. 22–27.

The ALJ also reviewed plaintiff's medical history for right shoulder and hand pain from past injuries as well as his medical care, including hospitalizations, for hypertension and seizures. *Id.* The ALJ reviewed records that indicated plaintiff's lack of medical treatment for 15 years for his seizures, plaintiff's noncompliance with medical treatment, and that plaintiff's seizures were well controlled with medication. R. 18, 22, 27. Records specifically relating to his hand and shoulder pain revealed normal physical exam findings, plaintiff initially declining treatment for his shoulder and hand, and plaintiff's improved range of motion following physical therapy. R. 22–27.

Further, the ALJ reviewed plaintiff's July 2021 hearing testimony and June 2019 and March 2020 function reports. R. 21. The function reports indicated that plaintiff prepares meals, attends appointment, does chores, goes outside daily, shops, handles finances, and engages in social activities.[12] *Id.* (citing R. 343–351, 364–72). Additionally, plaintiff testified at the hearing that he has not had a seizure in six months, his right hand was injured but he can bend his index finger and thumb, that he had some improvement with range of motion but still cannot grip or

---

[12] It should be noted that the ALJ's statement that plaintiff "follows written instructions well" with citations to the June 2019 and March 2020 function reports is incorrect. *See* R. 21. Instead, the function reports indicate that plaintiff can follow verbal instructions, if repeated to him. *See* R. 349, 370.

carry things, wears a brace on his right arm, and cannot use his bad hand to grip or use hand tools. *Id.* He also stated that since his surgery, he has been unable to eat certain foods or stand for a long period of time and he has pain from constipation. *Id.* Plaintiff testified that he sits at least four hours during the day and sometimes has to lay down. *Id.* And, he cannot lift a gallon of milk with just his right hand, he has pain in his palm when he tried to grip things, and he cannot open jars. *Id.*

Based on the foregoing substantial evidence, the ALJ reasonably concluded that plaintiff was not disabled and possessed an RFC for "light work." R. 20. The ALJ found that plaintiff's hand injury was limited to "only a few fingers." R. 27. He noted plaintiff's history of noncompliance with medication and treatment and his generally normal physical examination findings. *Id.* The ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 21.

Based on this record, the Court rejects plaintiff's assertion that the ALJ failed to properly develop the record. Pl.'s Mem. 12–13. At the hearing before the ALJ, plaintiff was represented by counsel who stated to the ALJ that there was no outstanding evidence that would impede a full and fair hearing. R. 47. Due to some questions raised during the hearing, ALJ left the record open for over 45 days, but no response was received. R. 15. And, when a "[c]laimant was represented by counsel, . . . the ALJ [i]s allowed to presume that he presented his best case." *Schaller v. Colvin*, No. 5:13-CV-334-D, 2014 WL 4537184, at *9 (E.D.N.C. Sept. 11, 2014) (citing *Aytch v. Astrue*, 686 F. Supp. 2d 590, 599 (E.D.N.C. 2010)). Plaintiff also never requested a consultative examination at the administrative level. Although the ALJ has the "responsibility to help develop

37

the evidence," *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986), it is plaintiff's responsibility to prove that he is disabled, *Rose M. C. v. Comm'r of Soc. Sec.*, No. 2:21cv413, 2022 WL 2951462, at *10 (E.D. Va. June 29, 2022), *report and recommendation adopted*, 2022 WL 2919269 (E.D. Va. July 22, 2022). *See also Webb v. Berryhill*, No. 1:17cv341, 2018 WL 2198829, at *12 (M.D.N.C. May 14, 2018), *report and recommendation adopted*, 2018 WL 2583113 (M.D.N.C. June 4, 2018) ("Having failed to raise the issue of missing opinion evidence at the hearing, Plaintiff cannot wait until after the ALJ issues his decision to challenge the ALJ's development of the record.").

The record also indicated that plaintiff had surgery for his diverticulitis (R. 4193, 4197) and, after a hospital stay for postoperative complications (R. 4174–91), reported that he was "doing much better" and was recuperating well. R. 4296, 4310. Plaintiff's own testimony was that his diverticulitis had improved after surgery. R. 61. He indicated that his only limitations due to his diverticulitis following surgery was that he cannot eat certain foods, stand for too long, and has some pain in his lower abdomen because of constipation. R. 61, 63–65. And, due to plaintiff's testimony, the ALJ added limitations not included in the state agency physicians' opinions. R. 27. The ALJ limited plaintiff "to standing or walking up to four hours total in an eight-hour workday" and that plaintiff is able to "frequently but not always handle objects with his right hand." R. 20.

Therefore, based upon the consistency and sufficiency of the record, no need existed for the ALJ to order a consultative examination. *See Caulkins*, 2022 WL 1768856, at *5 (declining to set aside the ALJ's RFC analysis "simply because the ALJ is a layman and did not obtain an expert medical opinion" and noting that suggestion to do so "misapprehends the agency's administrative review process") (internal citations and quotations omitted)).

38

## VI.   **RECOMMENDATION**

For the foregoing reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 18) be **GRANTED**.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 22, 2022

40